# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

     v.                                No. 3:14-cr-00185 (JAM)

RAUL CHAVEZ and ANDREW DURON

## RULING ON MOTIONS TO SUPPRESS

The government has charged defendant Raul Chavez with conspiring to distribute cocaine. He moves to suppress evidence on the grounds that he was arrested without probable cause and that his post-arrest statements were made in violation of his *Miranda* rights. *See* Docs. #29-1, #31, #35, #44, #45. Following a suppression hearing, I now conclude that law enforcement officers had probable cause to arrest Chavez, that Chavez did not invoke his *Miranda* right to counsel or to silence, and that Chavez otherwise validly waived his *Miranda* rights. Accordingly, the Court will deny Chavez's motions to suppress.

### BACKGROUND

The following are my findings of fact based on the record and testimony from the suppression hearing.[1] Beginning in October 2013, Chavez's co-defendant Andrew Duron was the subject of a DEA investigation and reverse sting operation. At that time, he and a confidential source for the DEA began negotiations for the confidential source to sell Duron large amounts of cocaine. Eventually, they met in New Jersey and agreed to a deal for five kilograms for approximately $28,000 a kilogram. Duron told the confidential source that he would need to

---

[1] I rely on facts as set forth in the suppression hearing testimony of DEA Task Force Officer Francis Bellizi (Doc. #62), as well as the filed affidavits of DEA Special Agent Jay Salvatore (Doc. #56-1) and DEA Task Force Officer Jeffrey Poulin (Doc. #56-2).

drive back to Connecticut to speak with his associates and would then contact him to confirm the deal and arrange the sale. In July 2014, Duron and the confidential source met again in North Carolina for further negotiations. There, Duron stated that he wanted to purchase up to 50 kilograms of cocaine at $28,000 a kilogram, and he phoned someone he described as the "main guy." Doc. #56-1 ¶ 10.

In early August 2014, Duron phoned the confidential source multiple times, stating that he was in Texas but was ready to buy cocaine in Connecticut. Duron proposed to first purchase 25 kilograms of cocaine, then to later purchase another 25 kilograms. On August 14, a DEA undercover agent met with Duron in New Jersey, and they agreed on a plan for Duron initially to show or "flash" the undercover agent a sum of $700,000 and then for the agent in turn to deliver 25 kilograms of cocaine within four hours. They agreed to complete the deal in Connecticut on Saturday, August 23, at a location to be determined. During the course of the many negotiation conversations, Duron told the undercover agent on multiple occasions that he was "waiting for my guys to come up." *Id.* ¶ 14.

On August 23, 2014, Duron and the undercover agent met at a Starbucks in Wethersfield, Connecticut. This meeting was subject to surveillance by law enforcement officials, including Francis Bellizi, a DEA task force officer who testified at the suppression hearing. Doc. #62 (Mar. 20, 2015 Tr.). The undercover agent was "wired" so that surveillance officers could contemporaneously monitor the substance of conversations between him and Duron. At the Starbucks, Duron stated in substance that "his guys, the main guys were here," and he told the agent to follow him to a Target department store shopping plaza in Windsor, Connecticut. Doc. #62 at 18; *see also* Doc. #56-1 ¶ 15.

The two then drove in separate vehicles to the shopping plaza, arriving at around 12:45

p.m., by which time multiple law enforcement officers had also arrived to covertly observe the scene and subsequent events. Once at the parking lot, Duron and the undercover agent parked directly next to each other. Duron told the agent that he was going to go meet the "guy," get the money from a house, and return with it in 20 minutes. Doc. #56-1 ¶ 16. Duron then walked into the Target store, where he remained for the next approximately 20 minutes.

In the meantime, while Duron was still inside the store, Chavez was observed arriving at the shopping plaza in a car driven by another Hispanic male. Bellizi testified that he saw a Nissan Altima with Massachusetts license plates drive past him along the road running in front of the Target store. According to Bellizi, Chavez was in the front passenger seat with the window open. He saw that Chavez "was looking about the lot, scanning the lot," and this caught Bellizi's attention because "you really don't see that type of behavior." Doc. #62 at 29.

Soon, Duron came out in front of the store and began speaking with Chavez and another Hispanic male who was later identified as Angel Ramirez. Bellizi could see that the conversation was "mostly directed between Mr. Duron and Mr. Chavez." Doc. #62 at 28. At some point, a woman who would later be identified as Chavez's wife approached the group briefly and then walked away. Eventually, Ramirez went into the store, leaving Duron and Chavez in continued conversation. None of the individuals was seen with any shopping bags.

After his conversation with Chavez, Duron walked back to the undercover agent's car in the parking lot and told him the money would arrive shortly. Some more time passed, and the agent asked Duron what was going on. Duron said that he would talk again to his contact. He approached and spoke to Chavez outside the Target store, then returned to the agent to explain that the individual with the money had gone to the wrong Target store but would be arriving shortly. Duron said he would move his car so that the individual with the money could park next

to the agent and allow him to inspect the money.

Around 2:30 p.m.—now more than an hour and a half after Duron and Chavez had arrived at the shopping plaza—a burgundy Jeep Wrangler arrived. Duron moved his vehicle to another spot, and the Jeep parked in the spot he had vacated next to the undercover agent. The agent left his vehicle and approached the passenger-side window of the Jeep for a minute or two. Inside the Jeep, the driver—a Hispanic male—showed the agent a cash-stuffed duffel bag, but the agent learned that it was only about half of the agreed-upon $700,000.

The Jeep then drove across the parking lot to a parking space about two or three spots from where was parked the Nissan Altima in which Chavez had arrived. At that time, in view of the large amount of money that had been "flashed" to the undercover agent, the surveillance team determined that it was time to move in and make arrests. Bellizi arrested Doron, while other officers across the parking lot closed in to arrest Chavez, who was then walking toward the Jeep. They also arrested Ramirez, who was getting into the Nissan Altima, and they arrested another Hispanic male, Jesse Rosales, who was at that time in the driver's seat of the Jeep.[2] On the back seat of the Jeep was a duffel bag with $284,860 in cash, and in the glove compartment was a loaded .38 caliber revolver.

Chavez was immediately advised of his *Miranda* rights. He told the officers that he was in Connecticut to visit his godson, Rosales, and that they were going to attend a party. Officers seized from Chavez's person two cell phones, as well as six more cell phones from the Jeep occupied by Rosales and from the car occupied by Duron. Eventually, the government applied for and obtained a search warrant to search the contents of the eight cell phones.

---

[2] According to the government, the government initially misidentified the driver of the Jeep when the money was shown to the undercover agent as Rosales, when in fact it was Ramirez; the government contends that after the money was shown, Rosales took Ramirez's place in the Jeep, while Ramirez went to the Nissan Altima in which Chavez had been riding. *See* Doc. #56-2 at 8–9 n.1. Whether the driver of the Jeep at the time of the "money flash" was Rosales or Ramirez is not material to the Court's determination of probable cause as to Chavez.

Chavez was soon transported to a DEA office for questioning, and his statements there were videotaped. *See* Doc. #60-2 at 2; Gov't. Exh. 2. At the beginning of the interview, the agents advised Chavez again of his *Miranda* rights, both orally and by presenting him with a written form. First, the officers noted that the rights of which they were advising him were the same as those they had discussed earlier in the day, to which Chavez responded "Yes sir." Doc. #60-3 at 2; Doc. #61 at 1. Special Agent Salvatore then recited Chavez's *Miranda* rights:

> Before we ask you any questions, do you understand you have the right to remain silent, anything you say can be used against you in court, you have the right to talk to a lawyer for advice before we ask you any questions, you have the right to have a lawyer with you before you answer any questions, if you cannot afford one, one will be appointed for you. Do you understand?

Doc. #60-3 at 2; Doc. #61 at 1. Chavez responded "yes." Doc. #60-3 at 2; Doc. #61 at 1.

Following this acknowledgment, the agents asked whether Chavez was willing to answer some questions, to which he asked what he was being charged with and stated that he wanted to know the charges "before I say anything." Doc. #60-3 at 2; Doc. #61 at 2. The agents attempted to review again the advice-and-waiver-of-rights form, but Chavez was unwilling to sign the form, expressing now his wish that a lawyer read the form to him because "I don't know what I'm being charged with and I don't want to sign something to get me in trouble cause I didn't read it." Doc. #60-3 at 2; Doc. #61 at 1.[3] In his brief, Chavez reiterates this explanation for his reference to a lawyer, stating that he was "unable to read the sheet and asked if he could have a lawyer to read [the rights] to him, indicating that he didn't know what he was being charged with and didn't want to get in trouble for signing something he could not read." Doc. #29-1 at 6.

After the agents again explained that the form was only an outline of Chavez's rights, and

---

[3] The parties disagree about the precise wording that Chavez used in referring to a lawyer with respect to reading his rights. Defendant contends that Chavez said: "Can I have a lawyer read them to me?" Doc. #60-3 at 2. The government contends that Chavez said "I'll have a lawyer read them to me." Doc. #61 at 2. Under either version of the words used by Chavez, I conclude that Chavez did not unequivocally invoke his right to counsel in connection with questioning.

Chavez again indicated that he wanted to know any charges before signing anything, Salvatore

told Chavez that they were investigating a narcotics conspiracy. He again asked whether Chavez

understood his right to remain silent, and Chavez stated, "[y]es, I understand that I have the right

to remain silent. But I don't understand what I'm being charged for." Doc. #60-3 at 3; Doc. #61

at 3. The agents told him he did not have to sign the form. Salvatore asked one more time: "You

understand your rights, right?" to which Chavez responded, "I understand my rights." Doc. #60-

3 at 3; Doc. #61 at 3. The conversation then turned to discussion of the charges in connection

with a conspiracy for narcotics. Chavez told the agents that "I could answer you some questions

if you ask if I understand them. I don't mind[.]" Doc. #60-3 at 3; Doc. #61 at 3. Questioning

about Chavez's visit to Connecticut ensued, and Chavez thereafter made statements that the

government intends to introduce at trial.

DISCUSSION

Chavez moves to suppress evidence on two grounds. First, he contends that he was

arrested without probable cause in violation of the Fourth Amendment, and on this basis seeks

suppression of the physical evidence subsequently seized from him (including his cell phones)

and the statements he made while under arrest. Second, he contends that his statements were

obtained in violation of his *Miranda* rights, because he was subject to questioning after he had

invoked his rights to silence and to counsel and because he did not otherwise validly waive his

*Miranda* rights.

### Probable Cause for Arrest

The Fourth Amendment guarantees in part "[t]he right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures." An arresting

officer may make a warrantless arrest consistent with the Fourth Amendment when he has

6

"probable cause to believe a crime has been or is being committed." *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir. 2008) (citing *United States v. Watson*, 423 U.S. 411, 417 (1976)).

Probable cause exists when officers have "'reasonably trustworthy information as to [ ] facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been . . . committed by the person to be arrested.'" *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (alterations in original) (quoting *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007)). As the Supreme Court has oft advised, probable cause is "'a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.'" *Florida v. Harris*, 133 S. Ct. 1050, 1056 (2013) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). All that is required for a determination of probable cause is a fair probability of criminal conduct in light of the totality of circumstances. *Id.* at 1055–56. "Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 124, 128 (2d Cir. 1997) (citing *Baker v. McCollan*, 443 U.S. 137, 145–46 (1979)).

Here, I conclude that the facts known to the officers at the time established clear probable cause to place Chavez under arrest. To begin with, the officers knew that Duron was not working alone but that he had associates and was acting under orders from the "main guy." Chavez was seen arriving at the Target shopping plaza shortly after Duron arrived, and he was "scanning" the parking lot in an unusual manner. Chavez was thereafter observed twice speaking with Duron in front of the Target store, both times shortly after Duron had departed from the undercover agent to seek further direction and information about the arrival of the money to show the agent.

Neither Chavez nor his companions had any shopping bags, and there was no indication that Chavez was at the shopping plaza to shop. Indeed, Chavez arrived at the plaza at approximately 12:45 p.m., and he was still there for apparently no legitimate reason more than an hour and a half later at 2:30 p.m. when the Jeep arrived to flash the money. When the agents finally closed in to make arrests, Chavez was walking toward the Jeep, and the Jeep was parked but a few spaces away from the Nissan Altima in which Chavez arrived. All in all, the totality of the circumstances gave rise to a fair probability that Chavez was the "main guy" or some other culpable associate of Duron's who was there to aid in the intended cocaine deal.[4] The agents had probable cause to arrest Chavez.

### Post-Arrest Statements

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court famously ruled that the government may not use a suspect's statements against him at trial if the statements were the result of custodial interrogation and if the police did not employ appropriate procedural safeguards to protect the Fifth Amendment privilege against self-incrimination (such as to administer warnings and to obtain a knowing, intelligent, and voluntary waiver of the suspect's rights to silence and to counsel). *See, e.g.*, *United States v. Medunjanin*, 752 F.3d 576, 585–87 (2d Cir. 2014) (discussing *Miranda* rule). Here, there is no dispute that Chavez was subject to custodial interrogation that triggered his *Miranda* rights.

Chavez first argues that he was subject to questioning despite having asserted his right to counsel. The *Miranda* rule requires that all questioning of a suspect stop if the suspect invokes

---

[4] Chavez was plainly arrested at the scene, and I do not credit the government's alternative argument that Chavez was subject merely to an investigative detention that only later ripened into an arrest after Chavez was transported for questioning to a DEA office and when agents learned more facts about Chavez. In addition, at the suppression hearing, Chavez made clear that his Fourth Amendment claim challenges the existence of probable cause only at the time of arrest, not at the later time that law enforcement authorities applied for search warrants, and I therefore do not consider information learned about Chavez after he was placed under arrest or any challenge to the subsequent search warrants.

his right to counsel and that it not resume unless counsel is present or unless the suspect re-initiates communications with the police. *See, e.g.*, *Edwards v. Arizona*, 451 U.S. 477, 482 (1981); *United States v. Gonzalez*, 764 F.3d 159, 165–66 (2d Cir. 2014). But a suspect's invocation or request for counsel must be clear and unequivocal. *See Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010); *Davis v. United States*, 512 U.S. 452, 459 (1994). The Supreme Court and Second Circuit have found too ambiguous or equivocal statements such as "Maybe I should talk to a lawyer," *Davis*, 512 U.S. at 462, "Do you think I need a lawyer?" *Diaz v. Senowski*, 76 F.3d 61, 64–65 (2d Cir. 1996), "I don't know if I need a lawyer," *United States v. Plugh*, 648 F.3d 118, 125–27 (2d Cir. 2011), and statements that a suspect "was going to get a lawyer," *United States v. Scarpa*, 897 F.2d 63, 68–70 (2d Cir. 1990), or already had a lawyer in another case, *United States v. Oehne*, 698 F.3d 119, 123 (2d Cir. 2012). By contrast, the Second Circuit has found that the statement "I think I should get a lawyer," amounted to an unequivocal request for counsel, because it did not include "perhaps" or "maybe" and "evidence[d] no internal debate whatsoever." *Wood v. Ercole*, 644 F.3d 83, 91 (2d Cir. 2011).

Relatedly, the *Miranda* right to counsel is triggered only by a request "that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police*." *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991) (emphasis in original). It follows that if a suspect makes only a limited request for the assistance of counsel in some manner that does not involve assistance in responding to questions by the police, then *Miranda* does not prevent officers from continuing to question the suspect. For example, the Supreme Court has ruled that police were not foreclosed from questioning a suspect who refused to provide a written statement without the presence of an attorney but who otherwise made clear that he was willing to give an oral statement. *See Connecticut v. Barrett*,

9

479 U.S. 523, 527–30 (1987); *see also United States v. Mikelic*, 2011 WL 4368565, at *11 (D. Conn. 2011) (Droney, J.) (*Miranda* did not bar questioning of suspect who "expressed a desire to cooperate with law enforcement officers and wanted to 'answer some questions,'" and who "stated that he wanted to speak with his lawyer with respect to certain questions," without "immediately identify[ing] the questions or issues he desired to consult with his attorney on"); *United States v. Newton*, 2012 WL 170008, at *7 (D. Vt. 2012) (*Miranda* did not bar questioning of suspect who invoked his right to counsel only for purpose of whether to sign a written waiver-of-rights form, noting that "after Defendant revealed that he knew how to invoke his right to counsel, he did so for the limited purpose of ensuring that he did not sign anything without consulting an attorney first," and that "[a]n invocation of counsel for a limited purpose is valid and does not automatically extend to questioning that occurs thereafter").

In light of the foregoing legal framework, I conclude that Chavez's single reference to a lawyer was not an unambiguous request for an attorney and, to the extent it could be said to be unequivocal, it was no more than a limited request for an attorney to read him the written *Miranda* rights form, as opposed to a request for an attorney to represent him in connection with any questioning. When presented with the *Miranda* form, Chavez said either: "Can I have a lawyer read them to me? 'Cause I don't know what I'm being charged with and I don't want to sign something to get me in trouble cause I didn't read it," Doc. #60-3 at 2, or "I'll have a lawyer read them to me because I don't know what I'm being charged with and I don't want to sign something to get me in trouble cause I didn't read it," Doc. #61 at 2. Rather than belabor the written form, the agents respected Chavez's desire not to sign a form he could not read, put the form away, and confirmed orally—multiple times—that Chavez understood his rights before beginning any substantive questioning. I find that Chavez's words did not amount to an

unambiguous invocation of his Fifth Amendment right to an attorney for any purpose other than reading the form, which he freely chose not to sign.

Nor did Chavez invoke his right to silence (as distinct from his right to counsel). A suspect who wishes to invoke his *Miranda* right to silence must do so unambiguously. *See Berghuis*, 560 U.S. at 381–82. When asked whether he was willing to answer questions, Chavez responded by asking what he was being charged with. "First, before I say anything, I want to know what I'm being charged with." Doc. #60-3 at 2; Doc. #61 at 2 (omitting the final three words). A few moments later, when asked whether he was willing to sign the written form, he again stated: "Well, I wanna know what I'm being charged for before I sign anything." Doc. 60-3 at 3; Doc. #61 at 2. And when asked explicitly, "[d]o you understand you have the right to remain silent, yes or no?" Chavez responded "[y]es, I understand I have the right to remain silent. But I don't understand what I'm being charged for." Doc. #60-3 at 3; Doc. #61 at 3. The agents then confirmed a final time that Chavez understood his rights (to which he stated "I understand my rights"), told him he did not need to sign the written form, and explained that he was "being charged in connection with a conspiracy for a narcotics violation." Doc. #60-3 at 3; Doc. #61 at 3. They asked whether he wanted to answer questions about it. Chavez stated "I could answer you some questions if you ask if I understand them." Doc. #60-3 at 3; Doc. #61 at 3. The agents asked one more time whether he understood; Chavez stated, "I understand." Doc. #60-3 at 3; Doc. #61 at 3. Then questioning began. At no point afterward did Chavez state that he wished to remain silent.

Chavez's only statement relating to his right to silence was his statement that "before I say anything, I want to know what I'm being charged with." *See* Doc. #60-3 at 2; Doc. #61 at 2 (omitting the final three words). This was consistent with his expressed desire not to sign the

form before hearing the charge against him and amounted to a conditional statement that he would not speak until told the charges. He repeated several times that he understood his rights and explicitly stated that he understood his right to remain silent but did not understand the charge against him. Just over two minutes into the interview, after Chavez had repeatedly confirmed that he understood his *Miranda* rights, the agents explained that the charge against him involved a narcotics conspiracy, and Chavez told them that he was willing to answer questions if he understood them. Chavez did not unambiguously assert his right to silence, and even to the extent that he conditionally asserted a right to silence, it is clear that this condition was satisfied when he was advised of the nature of the charge against him, and he chose then to continue speaking with the agents.

Finally, apart from his claims that he invoked his right to counsel and to silence, I conclude that the government has carried its burden to show that Chavez validly waived his *Miranda* rights. *See, e.g.*, *United States v. Murphy*, 703 F.3d 182, 192–93 (2d Cir. 2012). Despite the fact that Chavez declined to sign the *Miranda* waiver form, the government was not required to have him waive his rights in writing. *See North Carolina v. Butler*, 441 U.S. 369, 374–75 (1979); *United States v. Boston*, 508 F.2d 1171, 1175 (2d Cir. 1974). Indeed, the Supreme Court has made clear that *Miranda* "does not impose a formalistic waiver procedure that a suspect must follow to relinquish those rights" and that "[a]s a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Berghuis*, 560 U.S. at 385.

Here, the video evidence shows that Chavez was advised of all his rights orally and then agreed to speak with the agents. There is no contention that the agents coerced Chavez (Doc.

#29-1 at 8), and the evidence shows that his statements were voluntarily given. Nor is there any basis to conclude that he did not understand his rights as explained to him or that he did not waive his rights when he promptly agreed to answer questions. *See Berghuis*, 560 U.S. at 388 (noting that "after giving a *Miranda* warning, police may interrogate a suspect who has neither invoked nor waived his or her *Miranda* rights" and that "[o]n these premises, it follows the police were not required to obtain a waiver of [defendant's] *Miranda* rights before commencing the interrogation").

Chavez argues that his inability to read the written rights form demonstrates that he did not have a full awareness of the rights being waived or the consequences of waiving them. Chavez's refusal to sign the written waiver form, in context, is far more consistent with a desire not to sign something he did not feel comfortable reading than with an indication that he did not understand his rights. In fact, he expressly indicated at least four times out loud that he understood his rights: first, when the officers explained that they were describing the same rights they'd described earlier that day, Chavez responded "[y]es sir." Doc. #60-3 at 2; Doc. #61 at 1; second, when an agent recited the *Miranda* rights and asked whether Chavez understood, he said "yes." Doc. #60-3 at 2; Doc. #61 at 1; third, after an agent again asked whether Chavez understood his rights and understood that he could remain silent, Chavez said "[y]es, I understand that I have the right to remain silent." Doc. #60-3 at 3; Doc. #61 at 3; finally, after taking away the written form, an agent asked again, "You understand your rights, right?" and Chavez responded "I understand my rights." Doc. #60-3 at 3; Doc. #61 at 3. Chavez's videotaped statement shows him speaking and understanding spoken English without visible trouble. His explicit statements that he understood his *Miranda* rights suffice to establish by more than a preponderance of the evidence that the waiver was knowing and voluntary, despite

his refusal to sign the form.

Chavez also argues that he may have suffered a concussion during his arrest. Although it appears undisputed that he was struck in the head by one of the agents during the course of his arrest, the video of his subsequent interview at the DEA office shows that he was alert and focused and without visible injuries. There has been no evidence introduced that indicates the extent of any injuries he may have suffered, or that such injuries would have interfered with his ability to understand and knowingly waive his rights. *See United States v. Robinson*, 2006 WL 923695, at *2, *5 (D. Conn. 2006) (defendant who had been drinking alcohol and who had visible head injuries, but who nevertheless appeared awake, alert, and coherent was not impaired to a degree that would have interfered with his ability to knowingly and voluntarily waive his *Miranda* rights).

In short, I conclude that Chavez did not unambiguously invoke his right to counsel or his right to silence. And I further conclude that Chavez voluntarily, knowingly, and intelligently waived his *Miranda* rights before responding to questioning from law enforcement agents.

### CONCLUSION

For the foregoing reasons, Chavez's motions to suppress (Docs. #29-1, #31, #35, #44, #45) are DENIED.

It is so ordered.

Dated at Bridgeport this 14th day of April 2015.


/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge

14